Filed 8/6/13  In re J.M. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.M. et al., a Person Coming Under the Juvenile Court Law. | H039138<br>(Santa Clara County<br>Super. Ct. Nos. JD20291, JD20292, JD20293) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.V.,<br><br>    Defendant and Appellant. | |

Appellant C.V. (the mother) challenges the juvenile court's order terminating her parental rights and selecting adoption as the permanent plan for her three children.  She claims that the court erred in failing to find that the parental relationship exception precluded termination.  We disagree and affirm the order.

**I.  Background**

The mother's three children, five-year-old Jo.M., three-year-old Ja.M., and eight-month-old H.R. (the children),were detained in August 2010.  Petitions were filed

alleging that the mother's chronic ongoing substance abuse placed the children at risk of physical harm and neglect in her care. The mother had not been caring for the children. Instead, she had left the children in the care of the children's great-grandparents, who were too aged and ill to care for them.[1] The mother had an ongoing and long-standing methamphetamine habit. The fathers of the children were both incarcerated. The eldest child reported that "he does not see [the mother] a lot," even though she lived with the great-grandparents. The maternal grandmother reported that she and the maternal great-grandparents had been taking care of the children "since they were born," with the great-grandparents providing "most of the care." The great-grandparents "didn't get any help from" the mother.

The mother and both fathers submitted on the social worker's report at the October 2010 jurisdictional hearing, and the court found the petition true. At the December 2010 dispositional hearing, the court removed the children from the mother's custody, placed the children in foster care, and ordered that the mother and both fathers be afforded reunification services. The mother's case plan required her to complete a specific parenting class and a program of counseling or psychotherapy, undergo random drug testing on a weekly basis, attend a 12-step program at least three times a week and provide verification of attendance, complete a substance abuse assessment, and participate in any recommended drug treatment programs. The court ordered that the mother was to have supervised visits with the children for two hours each week.

The mother, who was incarcerated until January 2011, completed a parenting class, attended NA, and completed a substance abuse program while she was in jail, but the parenting class was not the one required by her case plan. She was consistently visiting the children. At the July 13, 2011 six-month review hearing, the Santa Clara

---

[1] The maternal great-grandfather died in February 2011. The maternal great-grandmother was severely ill throughout the dependency proceedings.

2

County Department of Family and Children's Services (the Department) recommended that the mother's services be continued but that services for the fathers be terminated. The mother had completed a parent orientation class, but she had not completed the specific parenting class required by her case plan. She had attended 12 sessions of counseling with a therapist. The mother had not been compliant with her drug testing requirements. She had failed to test on "many occasions when she has been required to test." The mother had not been attending the required number of NA meetings each week. She had continued to consistently visit the children, but she was often late for visits. The court continued her reunification services and her weekly visits with the children. These visits were twice weekly for one hour each.

In November 2011, after a four-month transition period, the children moved from a foster home, in which they had been placed for a year, to a prospective adoptive home. At the November 2011 12-month review hearing, the Department recommended that the mother's services be terminated and a Welfare and Institutions Code section 366.26 hearing be set. The mother still had not completed the specific parenting class required by her case plan. She had continued to be noncompliant with the drug testing requirement. She had failed to test on many occasions and had once submitted a sample that the lab determined was not urine. The mother had nearly always been late for visits with the children. The court terminated the mother's reunification services and set a Welfare and Institutions Code section 366.26 hearing. The mother's supervised visits with the children were reduced to once a week for one hour.

Although the Welfare and Institutions Code section 366.26 hearing was originally set for March 2012, it was repeatedly continued. In August 2012, the mother filed a Welfare and Institutions Code section 388 petition seeking custody or reinstatement of reunification services. At the September 2012 hearing on this petition, the mother testified that the children were "real attached to me" during visits. She maintained that she and the children had "a very strong" bond. In her view, the children would "go

3

through a lot of pain" if she lost them. The mother claimed that "I'm the one that raised them, taught them." Her trial counsel introduced as an exhibit service logs describing the visits between the mother and the children. These logs showed that the mother, often accompanied by the maternal grandmother and the maternal great-grandmother, had pleasant visits with the children. They also demonstrated that the mother missed a number of visits and was often late for visits. The court denied the petition. A second such petition was summarily denied a couple of weeks later.

At the October 2012 Welfare and Institutions Code section 366.26 hearing, the sole issue was applicability of the parental relationship exception. The Department recommended that parental rights be terminated and adoption be selected as the permanent plan. The mother had continued to be late to visits. She was late for more than half of the visits after reunification services were terminated. It was undisputed that the children enjoyed the visits, that they had "a relationship with their mother," and that they "enjoy spending time" with her. The prospective adoptive family was open to future contact between the children and the mother.

The two older children, who were at this point six years old and four years old, gave inconsistent indications of their desires. They had both said they would like to live with their "biological family," but the eldest had also said that he would be "happy" if the court's decision was that he would live with the prospective adoptive parents. And he had told the prospective adoptive parents that "he feels bad as he wants to be in their home and 'loves it here' but doesn't want to say no to his mother." The middle child said that she wanted the prospective adoptive family to be "her forever family." The mother did not appear at the hearing, and her trial counsel did not present any testimony.[2]

_____

[2] The mother's trial counsel's original proposed witness list included the mother who "will testify as to her bond with the children," but her amended list did not include the mother.

4

The court rejected the mother's contention that the parental relationship exception applied. "[N]ot withstanding [*sic*] how pleasant the visits were, they continued to be supervised once a week for an hour or less and that could never . . . suggest that [the mother] had a parental role with the children." The court found that there was not a "beneficial" relationship, and, even if there was, it would not outweigh the benefits to the children of adoption. The court terminated parental rights and selected adoption as the permanent plan for the children. The mother timely filed a notice of appeal from the court's order.

## II. Analysis

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'" (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).) This is known as the parental relationship exception.

The proponent of the parental relationship exception bears the burden of producing evidence of the existence of a beneficial parental relationship. Because the existence of such a relationship is a factual issue, the court's finding on this point is reviewed for substantial evidence. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) "[A] challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental or sibling relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed." (*Ibid*.)

5

Even if the juvenile court finds a beneficial parental relationship, the parental relationship exception does not apply unless the court also finds that the existence of that relationship constitutes a "compelling reason for determining that termination would be detrimental . . . ." (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B).) A juvenile court's ruling on whether there is a "compelling reason" is reviewed for abuse of discretion as the court must "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption." (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315.)

"'The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.] Evidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1315-1316.)

The evidence before the juvenile court supports its finding that the mother did not have a *beneficial* relationship with the children. These children were detained when they were very young. The youngest was less than a year old and the eldest just five years old. Even before their detention, the mother was not their caregiver. The maternal great-grandparents (and to a lesser extent the maternal grandmother) had been responsible for the children since they were born. The children had little contact with

6

their mother prior to their detention despite the fact that she lived in the same home with them and the great-grandparents. Hence, she had not established a substantial *parental* relationship with the children prior to their detention. After their detention, the mother's relationship with the children was limited to supervised weekly visits. But for the period when she was incarcerated during the first few months after detention, the mother arrived late for most of these hour-long supervised visits, further limiting their duration. Given that she had failed to establish a parental relationship prior to detention, her frequently tardy, supervised visits could not possibly succeed in developing such a relationship.

The evidence relied on by the mother did not establish otherwise. It is not enough for a parent to show that they consistently visited the children. The parent must show that a parental relationship exists that is beneficial to the children. The mother testified at the hearing on her Welfare and Institutions Code section 388 petition that: (1) she had "raised . . . [and] taught" the children; (2) the children were "real attached to me" during visits; (3) she and the children had "a very strong" bond; and (4) she believed that the children would "go through a lot of pain" if she lost them. All of the other evidence demonstrated that the mother had not "raised" the children. The great-grandparents had taken on this burden because the mother shirked it. While it was undisputed that the children enjoyed the visits, the juvenile court was not required to credit the mother's subjective belief that the children were "real attached" to her or that they had a "strong bond." The children were plainly happy living with the prospective adoptive parents, who acted as and were treated by the children as their parents. The entire relationship between the children and the mother was a product of supervised visits that were frequently less than an hour long due to the mother's refusal to arrive on time. The juvenile court could have concluded that this type of relationship did not offer any significant benefit to the children.

Since substantial evidence supports the juvenile court's finding that there was not a beneficial parental relationship, there is no need to consider the "compelling reasons"

7

component of the parental relationship exception. A minimal parental relationship can never outweigh the benefit to young children of adoption into a home in which they are happy and flourishing. The juvenile court did not err in concluding that the parental relationship exception did not apply and terminating the mother's parental rights.

## III. Disposition

The order is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.

8